**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEBORAH KELLER, | |
| Plaintiff, | CASE NO. 21-cv-10905 |
| vs. | |
| TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, NEWYORK-PRESBYTERIAN HOSPITAL, and POKALA RAVI KIRAN, in his official and individual capacities, | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff DEBORAH KELLER ("Dr. Keller" or "Plaintiff"), by her attorneys, Goodstadt Law Group, PLLC, as and for her Complaint in this action against the TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK ("Columbia" or the "University"); NEWYORK-PRESBYTERIAN HOSPITAL ("NYP" or the "Hospital" and, collectively with Columbia, NYP-Columbia); and DR. POKALA RAVI KIRAN ("Dr. Kiran" and, together with Columbia and NYP, "Defendants"), hereby states and alleges as follows:

## NATURE OF THE CLAIMS

1.      Defendants Columbia and NYP have, over the course of many years, tolerated a toxic culture of gender discrimination, sexual harassment and rampant abuse among its physicians, staff and patients.

2.      Not only have Defendants failed to take action to protect the civil rights of its employees by addressing this unlawful and hostile climate and punishing those responsible for creating it, they aggravate the harm by viciously retaliating against those employees who have the temerity to complain.

3.     Dr. Keller, a distinguished and highly accomplished colorectal surgeon, is a victim of this unlawful and discriminatory culture.

4.     In particular, Dr. Keller was subjected to the blatant gender discrimination of her supervisor, Defendant Dr. Ravi Kiran, Division Chief of Colorectal Surgery.

5.     When Dr. Keller complained repeatedly to executives at Defendants, to Human Resources, and even externally to the Equal Employment Opportunity Commission, Defendants not only ignored those complaints outright, but also retaliated against Dr. Keller by diverting her patients, creating an unsustainable work schedule and environment, cutting off communications, sabotaging her career development research grant and, ultimately, refusing to extend her employment contract.

6.     In recognition of Dr. Keller's credentials and reputation, a number of her colleagues in Columbia-NYP's Department of Surgery attempted to intervene and provide Dr. Keller with a safe haven when they learned that Dr. Kiran had refused to extend her employment contract (based on retaliatory misrepresentations regarding Dr. Keller's performance to Defenadnt NYP's Surgeon in Chief), by helping transfer her internally to another surgery division so that she could keep her federally supported grant.

7.     In light of Dr. Keller's imminent transfer, Defendants continued to retaliate against Dr. Keller by suspending her privileges based on a false and pretextual characterization of her involvement in a clinical incident, delaying her contractual right to review of that suspension past her contract end-date, and subjecting her to significantly more severe discipline than her male colleagues who were in fact responsible for the incident, thus alienating Dr. Keller from her support within Columbia-NYP and disparaging her reputation in the medical community at large with a false narrative.

8.     Indeed, Defendants have been so unrelenting in their retaliation against Plaintiff that they have not been merely satisfied to end her employment with Defendants, but have effectively prevented her from gaining employment at *any* institution by suspending her privileges because of the misconduct of her male colleagues, and then filing false and disparaging reports against her with a national information clearinghouse.

9.     While Dr. Keller's career has been effectively ended by Defendants, her male colleagues who were responsible for the very misconduct falsely attributed by Defendants to Dr. Keller have continued to practice and train at NYP-Columbia with virtually no adverse consequences; indeed, these same colleagues were subsequently hired by NYP-Columbia and used as role models for surgical trainees after the incident Defendants have used end Dr. Keller's career.

10.     This is an action for declaratory relief, as well as monetary damages, to redress Defendants' unlawful discriminatory and retaliatory employment practices against Plaintiff, including subjecting Plaintiff to disparate working conditions because of her gender and in retaliation for her protected complaints by *inter alia* derogating Dr. Keller to her colleagues and to third parties, providing her with unequal schedules, directing patient referrals and cases to male physicians, using bullying and microaggressions as common practice, sabotaging her research grant by refusing to supervise her, refusing to renew her contract, suspending her clinical privileges, and filing false and disparaging reports with the National Practitioners'' Database, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

11.     Defendants' discriminatory, retaliatory and otherwise unlawful conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff, which has caused and continues to cause Plaintiff to suffer substantial economic and non-economic damages, severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.  Further, the Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

13.     This Court also has jurisdiction over Plaintiff's claims arising under state and local law action pursuant to 28 U.S.C. § 1332, as Plaintiff is a resident of the State of California and each of the Defendants are residents of the State of New York, and the amount in controversy is greater than $75,000.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because, upon information and belief, Defendant are residents of the Southern District of New York and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PROCEDURAL REQUIREMENTS

15.     Prior to filing of this Complaint, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging a violation of Title VII against Defendants Columbia and NYP. Plaintiff's EEOC Charge of Discrimination arose out of the same facts alleged herein.

16.     On September 29, 2021, the EEOC issued Plaintiff a Notice of Right to Sue. This

Complaint has been filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue from the EEOC.

17.     Any and all other prerequisites to the filing of this suit have been met.

## THE PARTIES

18.     Plaintiff Deborah Keller is a former employee of Defendants, residing in Sacramento, California. Dr. Keller was employed by Defendants as a physician. At all relevant times, Dr. Keller met the definition of an "employee" under all applicable statutes.

19.     Defendant Trustees of Columbia University in the City of New York is, upon information and belief, a private research university whose principal place of operations is in the State, County, and City of New York. At all relevant times, Columbia met the definition of an "employer" under all applicable statutes.

20.     Defendant NewYork-Presbyterian Hospital is, upon information and belief, is a nonprofit academic medical center in the State, County and City of New York, affiliated with Columbia, which represents itself as one of the most comprehensive academic health care delivery systems in the nation. At all relevant times, NYP met the definition of an "employer" under all applicable statutes.

21.     Defendant Dr. Ravi Kiran is, upon information and belief, a physician and Division Chief of Colorectal Surgery at Defendants and a resident of Bergen County, New Jersey. At all relevant times, Dr. Kiran controlled significant functions of Defendants' business, was responsible for the discriminatory and retaliatory decisions set forth herein, and met the definition of an "employer" under all applicable statutes.

## **FACTUAL ALLEGATIONS**

### **Dr. Keller is Jointly Employed By Columbia and NYP**

22.     On or about December 7, 2017, Dr. Keller entered into a Faculty Practice Agreement with Defendant Columbia for a two-year term of employment as an Instructor in Surgery at Columbia University Medical Center.

23.     Dr. Keller's employment at the Medical Center began on April 1, 2018.

24.     In connection with Dr. Keller's employment by Columbia, she was admitted to practice by Defendant NYP as an Assistant Attending Surgeon.

25.     Columbia and NYP function as an integrated operation under the name "NewYork-Presbyterian/Columbia University Medical Center," with common ownership and control, and the officer of the Medical Center with direct control over the terms and conditions of Dr. Keller's employment represent both Columbia and NYP.

26.     During the course of Plaintiff's employment with Defendants, Defendant Columbia issued payroll checks to Plaintiff; however, Defendant NYP had joint control over the terms and conditions of Plaintiff's employment.

27.     During the course of Dr. Keller's employment by Defendants, employees of Defendant NYP and Defendant Columbia jointly supervised and otherwise controlled the conditions of Plaintiff's employment, including, but not limited to, through a shared human resources function.

28.     During all relevant times, Plaintiff was required to comply with both Defendant NYP and Defendant Columbia's policies, including, but not limited to, their respective employee handbooks.

29.     Defendants Columbia and NYP each has the power to hire and fire employees, as well as make other important personnel decisions, including Plaintiff.

30.     By way of example only, executives of Defendant Columbia were present at the meeting at which Dr. Keller's privileges were suspended by Defendant NYP, and, indeed, informed Dr. Keller that her NYP privileges had been suspended.

### Dr. Keller's Performance at Defendants

31.     By all accounts, Dr. Keller's performance throughout her tenure at Columbia has been stellar.

32.     Although Dr. Keller was a new surgeon in practice in a competitive market, she successfully developed her own practice with little assistance from Defendants—indeed, Dr. Kiran himself insisted that Dr. Keller bring in her own patients so that she did not "*cut into [his] pie.*" At the time of Dr. Keller's retaliatory suspension, she was booked approximately six weeks in advance.

33.     Dr. Keller's productivity numbers in her first year—approximately 6600 Relative Value Units ("RVUs")—were significantly higher than the standard value for surgeons in their first three years of practice (which, according to the Medical Group Management Association, generally amount to approximately 3000-5000 RVUs).

34.     In addition to Dr. Keller's outstanding patient satisfaction scores, her exemplary performance and research potential were also recognized in the Columbia Department of Surgery Junior Faculty Award she received in June 2019, together with her inclusion in the list of NewYork Presbyterian-Columbia Top Doctors and the New York Times Rising Stars in 2019 and 2020.

35.     As further evidence of her unblemished record of achievement, among other grant awards, in or around February 2019, Dr. Keller was awarded a KL2 Mentored Career Development Program Grant by the National Institute of Health.

36.     The KL2 Grant—which Dr. Keller was awarded after designing and drafting the application herself—is designed to prepare future research leaders by enabling them to conduct clinical research projects under the guidance of senior mentors.

37.     Beginning in March 2020, the KL2 Grant would have provided Columbia with 50% salary support for Dr. Keller for two years, as well as additional support for Dr. Keller's research, including protection of half of Dr. Keller's time from clinical activities.

38.     However, as set forth in greater detail below, Dr. Keller was ultimately unable to participate in the KL2 program as a result of Defendants' discriminatory and retaliatory non-renewal of her contract and suspension of her privileges.

**Dr. Keller is Discriminated Against By Defendants on the Basis of Her Gender**

39.     Although the KL2 Grant secured a federal funding stream for Dr. Keller's research, her promising career at Defendants was instead derailed by the relentless sexism of Dr. Kiran, Division Chief of Colorectal Surgery at Defendants and Dr. Keller's direct supervisor, which included blatant favoritism toward Dr. Keller's male colleagues, constant derogatory remarks based on her gender, and repeated attempts to undermine her ability to establish and maintain a practice at Defendants.

40.     By way of example only, in or around April 2019, Dr. Keller explained to Dr. Kiran some of the difficulties of establishing a practice in the Hasidic Jewish communities in Brooklyn to which she had been assigned, which included overcoming that community's prohibition against physical contact between men and women.

41.     Dr. Kiran replied, in sum and substance, that "*being a woman is a problem, but not because of that.*"

42.     Dr. Kiran furthermore regularly used coded language to criticize Dr. Keller on the basis of her gender, calling her, by way of example only,  "*aggressive,*" "*abrasive,*" "*assertive,*" "*confrontational,*" and "*overconfident*", while praising male attendings exhibiting the same behavior for showing "*leadership*" or "*passion.*"

43.     Dr. Kiran also made regular remarks about Dr. Keller's body and physical appearance, including, by way of example, telling Dr. Keller that she needs to make herself more "*presentable*" by wearing her hair down instead of pulled back in a ponytail, or that she should wear more make-up, smile more, and generally conform to traditional ideas of femininity.

44.     Dr. Keller not only received a lower starting annual compensation than her male colleagues, but also was held to higher performance standards by Dr. Kiran, including, by way of example only, being required to meet higher productivity quotas (despite receiving no compensation benefits for productivity gains), assume research and mentoring responsibilities from which her male colleagues were excused, and perform administrative responsibilities that were never assigned to her male colleagues, including continuously updating the division handbook.

45.     Dr. Keller was moreover pressured by Dr. Kiran to enter the female-dominated pelvic floor sub-specialization because of her gender, despite expressing other professional interests.

46.     Despite this pervasive gender discrimination, Dr. Keller continued to excel in her role. Dr. Kiran, however, took credit for Dr. Keller's accomplishments despite having no

involvement (which he never did for Dr. Keller's male colleagues), and belittled her when she complained by saying that she would not have received anything without him.

**Dr. Kiran Retaliates Dr. Keller for her Repeated Protected Complaints of Discrimination**

47.     In or around July 2019, Dr. Keller attended a mandatory annual advancement preparation meeting with Christine Rodhe, Vice Chair of Education for the Department of Surgery and Chief of Microvascular Surgery.

48.     During that meeting, Dr. Rodhe informed Dr. Keller that Dr. Kiran had falsely claimed to have completed two semiannual reviews of Dr. Keller's  performance.

49.     In response, Dr. Keller mentioned to Dr. Rodhe her struggle with Dr. Kiran's gender discrimination and bullying, including the fact that Dr. Kiran subjected her to significantly harsher treatment than her male colleagues.

50.     Dr. Rodhe told Dr. Keller that she was aware of Dr. Kiran's sexist behavior, and confided to Dr. Keller that other female faculty members had made similar complaints to her about Dr. Kiran in the past.

51.     Shortly after Dr. Keller's meeting with Dr. Rodhe, Dr. Kiran began retaliating against Dr. Keller in an effort to punish her for having complained and to dissuade her from pursuing her complaint further.

52.     By way of example only, in or around August 2019, Dr. Kiran sent Dr. Keller a baseless email falsely implying that her research was unproductive and that Dr. Smith was disappointed in her.

53.     Dr. Kiran likewise began cancelling his weekly research meetings with Dr. Keller. Indeed, after cancelling the meeting nine times in a row, Dr. Kiran finally sent Dr. Keller a text

message in or around September 2019 stating that he would no longer be meeting with Dr. Keller, thus impairing Dr. Keller's research progress and ability to meet his demands.

54.     In or around August 2019, Dr. Kiran also took away Dr. Keller's office after hiring two male attending physicians. Dr. Kiran moved Dr. Keller into an unmarked room outside of the Division, in the hallway behind the elevators, claiming that her previous office space was needed for the new attending physicians. Dr. Keller's previous office, however, remained vacant (and was used as a storage space), while Dr. Keller's nameplate, which had hung on the door, was thrown away rather than being moved to her new "office."

55.     Also in or around August 2019, Dr. Kiran allowed Dr. Keller's three male colleagues to take vacation at the same time, putting Dr. Keller in the unsafe situation of having to take care of multiple patients at different sites simultaneously. Dr. Kiran exacerbated this unsafe situation by telling Dr. Keller that she should not call him, because he would be "*too busy*" with his usual work to make himself available.

56.     In response to this unsafe patient situation, Dr. Keller made a second, protected complaint about Dr. Kiran's bullying and discriminatory behavior, this time to Saleha Ahmed, Director of Human Resources for the Department of Surgery at Defendants, in or around late August 2019.

57.     Like Dr. Rodhe, Ms. Ahmed also told Dr. Kiran that she was aware of Dr. Kiran's history of discriminatory treatment of female subordinates, specifically stating "*He has a problem with women. Craig Smith [NYP Surgeon in Chief] brought me here specifically to help address these issues*."

58.     Upon information and belief, Ms. Ahmed informed Dr. Kiran about Dr. Keller's second complaint of discrimination by telephone on the same day as their meeting in or around late August 2019.

59.     In or around September 2019—approximately three weeks after Dr. Keller's second protected complaint of discrimination to Ms. Ahmed, and approximately two months after Dr. Keller's first protected complaint to Dr. Rodhe—Dr. Keller was informed by Rodelyn Zapata, Administrative Coordinator, and Francine Castillo, Director of Practice Operations, that Dr. Kiran was seeking to discipline her, purportedly for a single negative comment by a patient on a Press Ganey Medical Practice Survey.

60.     Because Dr. Kiran's stated basis for this proposed discipline was clearly a pretextual attempt to conceal his retaliatory motive, Ms. Zapata and Ms. Castillo rejected his suggestion that Dr. Keller should be disciplined.

61.     Ms. Zapata and Ms. Castillo instead noted to Dr. Kiran that negative Press Ganey comments are common and that Dr. Keller's male colleagues had never been disciplined despite the fact that they had all received negative Press Ganey comments, including many that were significantly more negative than the comment directed at Dr. Keller for which Dr. Kiran was seeking to impose discipline.

62.     Indeed, Ms. Zapata and Ms. Castillo expressly suggested that Dr. Kiran was "*targeting*" Dr. Keller by proposing this baseless discipline.

63.     After learning of this discriminatory and retaliatory attempt to discipline her, Dr. Keller made a third protected complaint about Dr. Kiran to William Innes, Chief Human Resources Officer, in or around mid-September 2019, alleging gender discrimination, bullying, and retaliation.

64.     Mr. Innes suggested Dr. Keller pursue her complaint with Dr. Anne Taylor, Vice Dean of Academic Affairs. Dr. Keller therefore brought her complaint to Dean Taylor in or around mid-September 2019—her *fourth* protected complaint against Dr. Kiran in approximately three months—again alleging gender discrimination and retaliation.

65.     Dr. Keller simultaneously made another protected complaint—her *fifth*—with the University Ombuds Office.

66.     In or around early October 2019, Dr. Keller met in person with Dean Taylor regarding her complaint.

67.     During that meeting, Dr. Keller detailed Dr. Kiran's discriminatory and retaliatory actions, and the hostile environment he created based on Dr. Keller's gender.

68.     In response, Dean Taylor called Dr. Kiran's actions "*unacceptable*."

69.     Nevertheless, despite claiming to consider Dr. Kiran's discriminatory behavior "*unacceptable*," Defendants upon information and belief took no action in response to Dr. Keller's protected complaints following the October 2019 meeting with Dean Taylor.

70.     In or around October 2019, following her meeting with Dean Taylor, Dr. Keller made her *sixth* protected complaint of discrimination to Ms. Ahmed at a faculty event, informing her that the hostile work environment created by Dr. Kiran had grown more severe since her initial complaint, and explaining that Dr. Kiran was now retaliating against her, in part by refusing to speak with her at all.

71.     Although Dr. Keller was assured by Mr. Innes, Dean Taylor and Ms. Ahmed that her six complaints in approximately three months would be taken seriously, upon information and belief Defendants failed to investigate her <u>six</u> protected complaints of gender discrimination and

retaliation, did not impose any discipline on Dr. Kiran, and took no other steps to protect Dr. Keller or other female employees of Defendants from Dr. Kiran's unlawful misconduct.

72.     Accordingly, in or around October 2019, because of the University's disregard of her repeated complaints, Dr. Keller filed a formal complaint against Dr. Kiran with the Equal Employment Opportunity Commission—her *seventh* protected complaint of discrimination and retaliation—alleging sex-based discrimination and retaliation.

## Defendants Retaliate Against Dr. Keller for Her Protected Complaints By Refusing to Renew Her Contract

73.     Meanwhile, as a direct result of Defendants' neglect of Dr. Keller's seven protected complaints, Dr. Kiran's discriminatory and retaliatory mistreatment of her continued to escalate.

74.     By way of example, in our around September 2019, Dr. Kiran disparaged Dr. Keller to Dr. Hiram Sheish, Associate Professor of Radiology and research partner of Dr. Keller's, as a "*female surgeon, a problem, emotional, not someone to work with.*"

75.     Likewise, Dr. Kiran maligned Dr. Keller to Shevy Kahan, Executive Director of Chaim Medical Resource, a large-scale external referral agency, in sexist terms, saying in sum and substance, in reference to Dr. Keller, "*don't refer to that girl.*"

76.     Dr. Kiran also took steps to damage Dr. Keller's performance and research activities in retaliation for her protected complaints.

77.     By way of example only, in or around September 2019, Dr. Kiran began sending new-patient referrals exclusively to Dr. Keller's male colleagues. Dr. Kiran even alerted the Division's administrative staff to assign new patients only to Dr. Keller's male colleagues, omitting Dr. Keller entirely.

78.     In or around November 2019, Dr. Kiran changed the clinic schedule to ensure that Dr. Keller was allotted less clinic space than a male colleague scheduled for the same time, despite the fact that Dr. Keller had at least the same number of patients, and often more.

79.     Dr. Kiran also consistently booked Dr. Keller's patients at later hours, when Dr. Keller would not have the assistance her male colleagues received.

80.     Despite Dr. Kiran's attempts to sabotage Dr. Keller's career, Dr. Keller continued to excel in her role.

81.     Indeed, in recognition of her performance, in or around early December 2019, Dr. Keller was given the prestigious Young Researcher Award by the SAGES society.

82.     However, Dr. Keller was afraid to share the news with Defendants, as Dr. Kiran's discriminatory and retaliatory acts often intensified in the immediate aftermath of her professional achievements.

83.     This campaign of retaliation culminated in or around early December 2019, when Dr. Keller was given a letter during a meeting with Dr. Kiran and Ms. Ahmed notifying her that her contract with Columbia would not be renewed, without cause.

84.     When Dr. Keller asked why the University had decided not to renew her contract given the fact that her productivity was on par with her male colleagues—indeed, she was *more* productive than several colleagues—and that she had received a grant that would provide a funding source for her salary, Dr. Kiran responded by stating, in sum and substance, "*There is nothing. I don't need to have a reason.*"

85.     Dr. Keller informed Dr. Kiran and Ms. Ahmed that she was unwilling to accept the letter, as she believed the decision was in retaliation for her protected complaints of discrimination.

86.     In response, Ms. Ahmed dismissed the half-dozen protected complaints of gender discrimination Dr. Keller had made over the prior months by suggesting, in sum and substance, that "*bullying and aggression are not illegal in the workplace.*"

87.     This egregious mischaracterization of Dr. Keller's repeated protected complaints about Dr. Kiran's unlawful gender discrimination and retaliation—including internal complaints to Human Resources, Academic Affairs, and the University Ombuds, as well as an external complaint to the EEOC—illustrates Defendants' cavalier disregard of Dr. Keller's right to be free of discrimination and retaliation in the workplace.

88.     Indeed, Defendants' unlawful indifference to Dr. Keller's protected complaints enabled Dr. Kiran's mistreatment of her, which culminated in the University's retaliatory decision not to renew Dr. Keller's contract.

89.     Upon learning that the University was not renewing her contract, Dr. Keller made another protected complaint about Dr. Kiran's discrimination and retaliation, this time to Dr. Smith.

90.     Dr. Smith responded to Dr. Keller's eighth protected complaint by stating his false belief that Dr. Kiran had offered Dr. Keller a role with a heavier research focus, which Dr. Keller had refused.

91.     Dr. Keller immediately informed Dr. Smith that his understanding was inaccurate, that the research-focused role—which Dr. Keller had never turned down—was enabled by the KL2 grant Dr. Keller had been awarded, and that Dr. Keller had never had such conversation with Dr. Kiran. Nevertheless, no steps were taken by Defendants to address Dr. Keller's complaints of retaliation.

92.     Instead, Dr. Kiran's retaliation against Dr. Keller continued to escalate. By way of example, in or around early January 2020, Dr. Keller learned that Dr. Kiran was maligning her to Columbia-NYP faculty by claiming he had "*fired*" Dr. Keller her for "*technical issues*," despite having explained to Dr. Keller that her contract non-renewal was not performance related.

93.     Accordingly, on or about January 6, 2020, Dr. Keller *again* complained to Dean Taylor, filing a formal complaint that Dr. Taylor said she would convey to Dr. Smith. This was Dr. Keller's <u>ninth</u> protected complaint of retaliation and discrimination. Dr. Keller simultaneously filed a complaint with the University's Equal Employment Opportunity Officer.

94.     However, as with Dr. Keller's repeated complaints in the Summer and Fall of 2019, the University refused to discipline Dr. Kiran or take any other steps to protect its employees in response to these latest complaints.

95.     Indeed, Dean Taylor began simply ignoring Dr. Keller's requests for updates.

96.     Instead, upon information and belief, the University conducted a pretextual "investigation" which concluded after Dr. Keller's retaliatory suspension described below.

97.     This "investigation" did not even reference any of Dr. Keller's first eight protected complaints between Summer 2019 and early Winter 2020, and furthermore, upon information and belief, deliberately omitted material support for Dr. Keller's complaints that had been provided by at least one witness and (and by Dr. Keller herself).

98.     Meanwhile, throughout January 2020, Dr. Kiran continued to escalate his campaign of retaliation against Dr. Keller.

99.     By way of example only, in or around January 2020, in a further act of marginalizing Dr. Keller, Dr. Kiran moved her operating room from the colorectal core to a surgery room on another floor used predominantly by ENT and Orthopedic surgery, with staff

unfamiliar with abdominal surgery. The OR Nursing Manager confirmed the assignment change came from Dr. Kiran's office.

100.    At the same time, Dr. Keller was assigned a substantially heavier call schedule than any of her male colleagues, which included being on call during the Martin Luther King, Jr. holiday weekend, after having also been on call over the December holidays.

101.    Throughout January 2020, Dr. Kiran further retaliated against Dr. Keller by refusing to sign off on Dr. Keller's research activity and by ignoring the messages sent by Dr. Carly Bisset and Dr. Knut Augestad, two international surgeons with respect to whom Dr. Keller had been awarded traveling grants to support their coming to Columbia in Spring 2020 to work with her, with Dr. Kiran's prior approval.

102.    Following each instance of retaliation, Dr. Keller complained to Dr. Taylor and requested assistance. These complaints, however, were ignored.

### Defendants Suspend Dr. Keller for Pretextual Reasons in Retaliation for Her Protected Complaints

103.    On February 4, 2020, Dr. Keller was called to assist Dr. Mark Kiely in the extraction for a patient with a large foreign body in his rectum.

104.    Because Dr. Kiely was scheduled to perform the surgery, Dr. Keller was not responsible for communicating with the patient, completing the patient history and exam, or obtaining consent for the procedure. Indeed, Dr. Keller never spoke to the patient, saw or examined him while awake, or reviewed his chart.

105.    Dr. Keller was informed, however, by Dr. Kiely that all necessary consents had been obtained, including the standard consent to take images and video of the procedure for clinical, diagnostic or educational purposes.

106.     When Dr. Keller arrived in the operating room, the patient was already asleep. Dr. Keller made several unsuccessful attempts to extract the object before informing Dr. Kiely that she did not think the foreign body could be extracted transanally, and that he should set a time limit to open the patient's abdomen instead.

107.     Dr. Keller then left to perform her own case. After reaching the deadline, Dr. Kiely was forced to extract the object from the patient's abdomen. Dr. Keller was not involved in the abdominal portion of the procedure.

108.     Because the patient had a prior laparotomy, colostomy, and colostomy reversal, an extensive lysis of adhesions was anticipated. Although Dr. Keller left the room while Dr. Kiely and the residents commenced the abdominal portion, due to her recognized expertise, she was called back several hours later to help once the colon was exposed.

109.     Dr. Kiely attempted to push the foreign body out with Dr. Keller helping to extract it from below, to avoid opening the colon again. When this was unsuccessful, Dr. Kiely performed a colotomy with Dr. Keller holding the foreign body from below to control its exit.

110.     Dr. Kiely requested video of the procedure and, when Dr. Keller questioned why video was necessary, he reiterated the request.

111.     The video of the patient's abdominal area was filmed by a medical student and shows the struggle to remove the massive object. Although neither Dr. Keller nor Dr. Kiely is not seen in the video, they are both heard directing the residents at the table on technical aspects of the case.

112.     When finally removed, the foreign body was handed to Dr. Keller. Because it was too large for the pathology basin, Dr. Keller continued to hold it while a nurse looked for something large enough to place it in so it could be sent to pathology.

113.     Dr. Kiely then instructed a medical student to take photographs and videos of the foreign body for educational purposes. Upon information and belief, the patient had expressly consented to have photographs taken prior to the commencement of the operation.

114.     A photograph of the object was taken while Dr. Keller was holding it, in part because there was nowhere to place it down, but also for scale and to record in the patient's chart.

115.     No identifying details of the patient were visible in the photograph.

116.     The photograph was cropped, purged through an Exchangeable Image File Format ("EXIF") manager to remove tags, and sent to several members of the treatment team, again for educational purposes.

117.     In particular, Dr. Keller transmitted the photograph to a surgical resident who had previously tried to extract the object in the emergency room to demonstrate that he would not have been able to remove the object transanally and had risked inflicting serious injuries on the patient by attempting to do so multiple times. Instead, foreign objects of that size should always be extracted in the operating room.

118.     Despite the fact that Dr. Keller had conducted herself with the utmost professionalism throughout the February 4 extraction procedure, she was informed on or about February 5 that she was being placed on administrative leave by Defendants pending an "investigation" into the incident.

119.     Outrageously, on or about February 6, 2020, Dr. Keller was interrogated at a meeting with a committee comprised of various representatives of Defendants, including Dean Taylor.

120.    During the interrogation, the questioner repeatedly referred to the foreign body as a "dildo," egregiously sexualizing the object, while simultaneously accusing Dr. Keller of unprofessionalism.

121.    Additionally, the committee evinced the pervasive discriminatory bias of Defendants by interrogating Dr. Keller about the nature of her relationship with her medical partner, Dr. Kiely, including whether it was sexual. Conversely, the same committee did not subject Dr. Keller's male partner to this derogatory line of questioning.

122.    On or about February 13, 2020, Dr. Smith and Dean Taylor summarily suspended Dr. Keller's clinical privileges at NYP, prohibiting Dr. Keller from continuing to practice, based on the false and pretextual "finding" that she had purportedly violated the patient's right to privacy and dignity and had purportedly "failed" in her responsibility as a leader of the hospital.

123.    Dr. Keller promptly appealed the discriminatory and retaliatory decision to suspend her privileges pursuant to Defendants' bylaws, which afford Dr. Keller the right to a hearing within 30 days.

124.    Defendants however, refused to hold that hearing for more than six months—in direct violation of their own procedures—while simultaneously submitting false and inflammatory public reports to the National Practitioners' Database, as described below, before Dr. Keller had the opportunity to respond to Defendants' retaliatory allegations.

125.    Moreover, although Dr. Keller had been suspended "pending appeal," in the days following the suspension Dr. Kiran sent letters to all of Dr. Keller's patients stating that she had left the institution on February 4, 2020.

126.    Despite the pending appeal, Dr. Keller was immediately removed from the hospital website and her public profile was changed to "inactive."

127.     Patients and colleagues of Dr. Keller who called the office were told she had left the Hospital and would not be returning, even while the appeal was pending. The prejudgment of the outcome of the appeal demonstrates conclusively the pre-determined and pretextual nature of the process.

128.     Moreover, on or about April 15, 2020, Defendants reduced Dr. Keller's salary by approximately 50% because—as a direct result of Defendants' retaliatory misconduct—she was no longer an "active employee" of Defendants, even while Dr. Keller was actively volunteering to help on the frontlines of the COVID-19 pandemic.

129.     Defendant NYP finally held a hearing before a hearing commission of its own physicians on or about August 7, 2020, more than six months after they were required to do so by their own bylaws and after the end of Dr. Keller's employment contract on June 30, 2020.

130.     Defendants did not—and cannot—present any evidence of wrongdoing on Dr. Keller's part. Indeed, Defendants have not identified a single specific fact to support their baseless "findings."

131.     Instead, Defendants' suspension of Dr. Keller and its subsequent public filings regarding the incident represent nothing more than a pretextual attempt to disguise their intention to retaliate against Dr. Keller for having the temerity to pursue her complaints against Dr. Kiran.

132.     During the hearing, Defendants offered no evidence to support any of the proffered bases for the suspension of Dr. Keller's privileges; namely, the contention that Dr. Keller had significant violations of patient privacy, failed to act in accord with her professional responsibilities, failed to treat a patient with dignity or failed to fully cooperate during the investigation.

133.    To the contrary, Dr. Keller demonstrated through clear and convincing evidence that she had been informed by her medical partner—who has since been reinstated by Defendants—that he had obtained all necessary consents for photographs from the patient, that the only photograph Dr. Keller had or saw contained no identifying information of the patient whatsoever and were transmitted solely for educational purposes to members of the treatment team, and that at all times Dr. Keller treated the patient with respect and cooperated with Hospital investigators.

134.    Indeed, in response to the baseless accusation that Dr. Keller had violated patient privacy by circulating the photograph for educational purposes, Dr. Keller demonstrated that her phone still had Columbia's protected environments and EXIF manager installed, demonstrating that Dr. Keller took all necessary steps to protect patient confidentiality. Dr. Keller also refuted claims that she had distributed the photograph outside the treatment team by introducing the message stream.

135.    Defendants made no effort to justify a number of false claims NYP-Columbia filed on the National Practitioner Databank Report (which filings remain unamended despite the fact that Defendants could not substantiate them), including the allegation that Dr. Keller asked the circulating nurse to relay a message that described in unprofessional terms how she was occupied at that time, or that the pathologic specimen picture was described as a "'trophy."

136.    Dr. Keller moreover presented affirmative evidence that she had been discriminated against by Defendants and that the discipline imposed on her for pretextual reasons was in fact motivated by the same discriminatory animus—as demonstrated by the differential treatment of Dr. Keller and her male colleagues—and in retaliation for her numerous protected complaints.

137.    Following the hearing, Dr. Keller attempted to schedule additional sessions to provide Defendants with information, but Defendants cancelled each appointment, stating they did not need any further information from her.

138.    On or about September 11, 2020, Defendant NYP's internal hearing committee, ignoring the evidence of discrimination and retaliation, issued a determination that the suspension of Dr. Keller's clinical privileges had been appropriate and extending that suspension indefinitely.

139.    Dr. Keller promptly appealed this determination on or about September 18, 2020.

140.    On or around December 2, 2020, NYP's internal appellate review committee upheld the determination of the hearing committee on the basis that its findings were not "arbitrary or capricious."

### Defendants Retaliate Against Dr. Keller by Filing False, Defamatory Reports With the National Practitioner's Database That Make Obtaining Privileges Impossible

141.    On or about March 13, 2020—within weeks of Dr. Keller's pretextual suspension and months before Defendants held the required hearing on the unfounded allegations— Defendants reported Dr. Keller's suspension to the New York State Office of Professional Medical Conduct and the National Practitioner Data Bank (the "NPDB").

142.    Upon information and belief, NPDB is a "confidential information clearinghouse" created by Congress to provide the public with information about medical malpractice, unprofessional behavior, and patient abuse by physicians.

143.    Defendants report to the NPDB falsely accused Plaintiff of violating patient confidentiality, failing to treat a patient with respect and dignity, and failing to act in accord with her professional responsibilities, based upon the same meritless allegations as Defendants advanced in support of the suspension of Dr. Keller's privileges.

144.    Defendants made this report without providing Dr. Keller an opportunity to challenge their baseless and unlawful determination, thus deliberately creating a public record which Defendants recognized would make any future employment as a surgeon exceptionally difficult.

145.    Defendants then aggravated the immense harm caused by the initial NPDB report by filing a second report on or about May 28, 2021 about the same February 4 incident. There were no events since the August 7, 2020 appeal involving Dr. Keller – indeed Dr. Keller was *not actively employed* by Defendants during that period.

146.    Defendants' pretext for filing the second report—the issuance of a decision on Dr. Keller's appeal by Defendants' internal appeal committee—is transparently false, as NPDB procedures clearly state that such developments should be recorded as updates to an existing report, and do not merit a second, independent report.

147.    Dr. Keller has been informed by at least one member of a hiring committee at another institution that the second, unfounded NPDB report will disqualify her from consideration for clinical privileges at any institution.

148.    Egregiously, the other physicians who were suspended in connection with the February 4 incident—Dr. Keller's partner and three surgical residents, all male—did not have a single adverse report submitted regarding the incident to the NPDB, despite the fact that each of these physicians were more heavily involved in the incident than Dr. Keller.

149.    Indeed, upon information and belief, each of the other physicians disciplined in connection with the February 4 incident (all of whom are male) had their privileges restored and were all reinstated by Defendants in the subsequent months. Each continues to practice with no lasting adverse consequences from the February 4 incident.

150.    Conversely, Dr. Keller's privileges were not only permanently revoked by Defendants, but also, because of Defendants' retaliatory and improper filings with the NPDB, Dr. Keller is unable to obtain privileges at any institution.

151.    Indeed, at least three institutions  and a locums tenums agency that interviewed Dr. Keller have informed her that they would not be able to move forward with her candidacy because of the false and retaliatory NPDB reports.

152.    As a direct and proximate result of Defendants' unlawful actions, Dr. Keller has suffered, and will continue to suffer, monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits to which she would otherwise be entitled.

153.    As a further direct and proximate result of Defendants' unlawful actions, Dr. Keller has suffered irreparable damage to her reputation and career.

154.    As a further direct and proximate result of Defendants' unlawful actions, Dr. Keller has suffered severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress, depression, and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

155.    Defendants' unlawful conduct against Dr. Keller was intentional and malicious and/or showed a deliberate, willful, wanton and reckless disregard for Dr. Keller's rights under federal, state and local law.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Discrimination in Violation of the Title VII Against Defendants Columbia and NYP)

156.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

157.    Defendants Columbia and NYP have discriminated against Plaintiff on the basis

of her gender in violation of Title VII by, *inter alia*, denying her the same terms and conditions of employment available to employees who are men, including, but not limited to, subjecting her to disparate working conditions and pay by derogating her Dr. Keller to her colleagues to third parties, providing her with unequal schedules, directing patient referrals to male physicians, sabotaging her research grant by refusing to supervise her, refusing to renew her contract, suspending her clinical privileges, filing false and disparaging reports with the NPDB, and generally denying her the opportunity to work in an employment environment free of unlawful discrimination due to her gender.

158.    As a direct and proximate result of Defendant Columbia's and Defendant NYP's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

159.    As a direct and proximate result of Defendant Columbia's and Defendant NYP's unlawful discriminatory and harassing conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

160.    Defendant Columbia's and Defendant NYP's unlawful discriminatory and harassing conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Retaliation in Violation of the Title VII Against Defendants Columbia and NYP)**

161.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

162.    Defendants Columbia and NYP retaliated against Plaintiff in violation of Title VII for opposing and/or complaining of Defendant Columbia's and Defendant NYP's discriminatory practices against Plaintiff by, *inter alia*, derogating her Dr. Keller to her colleagues to third parties, providing her with unequal schedules, directing patient referrals to male physicians, sabotaging her research grant by refusing to supervise her, refusing to renew her contract, suspending her clinical privileges, and filing false and disparaging reports with the NPDB, all in retaliation for her repeated complaints about disparate treatement, harassment and hostile work environment, which Plaintiff believed in good faith represented a violation of federal law.

163.    As a direct and proximate result of Defendant Columbia's and Defendant NYP's retaliatory conduct in violation of the Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of damages.

164.    As a direct and proximate result of Defendant Columbia's and Defendant NYP's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

165.    Defendant Columbia's and Defendant NYP's unlawful and retaliatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was

done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL Against All Defendants)

166.     Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

167.     Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying her the same terms and conditions of employment available to employees who are men, including, but not limited to, subjecting her to disparate working conditions and pay by, *inter alia*, derogating Dr. Keller to her colleagues to third parties, providing her with unequal schedules, directing patient referrals to male physicians, sabotaging her research grant by refusing to supervise her, refusing to renew her contract, suspending her clinical privileges, filing false and disparaging reports with the NPDB, and denying her the opportunity to work in an employment environment free of unlawful discrimination due to her gender.

168.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

169.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

170.    Defendants' unlawful discriminatory and harassing conduct constitutes a willful and wanton violation of the NYSHRL, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL Against All Defendants)

171.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

172.    Defendants retaliated against Plaintiff in violation of NYSHRL for opposing and/or complaining of Defendants' discriminatory practices against Plaintiff by, *inter alia*, derogating Dr. Keller to her colleagues to third parties, providing her with unequal schedules, directing patient referrals to male physicians, sabotaging her research grant by refusing to supervise her, refusing to renew her contract, suspending her clinical privileges, and filing false and disparaging reports with the NPDB, all in retaliation for her repeated complaints about disparate treatment, harassment and hostile work environment, which Plaintiff believed in good faith represented a violation of federal law.

173.    As a direct and proximate result of Defendants' retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of damages.

174.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief

175.    Defendants' unlawful and retaliatory conduct in violation of NYSHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Aiding And Abetting Violations of NYCHRL Against Defendants Kiran)**

176.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

177.    Defendant Kiran knowingly and recklessly aided and abetted the unlawful employment practices and/or unlawful retaliation against Plaintiff in violation of NYSHRL.

178.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief against Defendant Kiran in his official and individual capacities.

179.    As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief against Defendant Kiran in his official and individual capacities.

180.    Defendant Kiran's unlawful retaliatory conduct in violation of NSHRL was willful, wanton, outrageous and malicious, and was done with conscious disregard of Plaintiff's civil rights, entitling her to an award of punitive damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Discrimination in Violation of the NYCHRL Against All Defendants)**

181.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing

paragraphs as if alleged fully herein.

182.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by denying her the same terms and conditions of employment available to employees who are men, including, but not limited to, subjecting her to disparate working conditions and pay by, *inter alia*, derogating Dr. Keller to her colleagues to third parties, providing her with unequal schedules, directing patient referrals to male physicians, sabotaging her research grant by refusing to supervise her, refusing to renew her contract, suspending her clinical privileges, filing false and disparaging reports with the NPDB,, and denying her the opportunity to work in an employment environment free of unlawful discrimination due to her gender.

183.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

184.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

185.    Defendants' unlawful discriminatory and harassing conduct constitutes a willful and wanton violation of the NYCHRL, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL Against All Defendants)**

186.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

187.    Defendants retaliated against Plaintiff in violation of NYCHRL for opposing and/or complaining of Defendants' discriminatory practices against Plaintiff by, *inter alia*, derogating Dr. Keller to her colleagues to third parties, providing her with unequal schedules, directing patient referrals to male physicians, sabotaging her research grant by refusing to supervise her, refusing to renew her contract, suspending her clinical privileges, and filing false and disparaging reports with the NPDB, all in retaliation for her repeated complaints about disparate treatement harassment and hostile work environment, which Plaintiff believed in good faith represented a violation of federal law.

188.    As a direct and proximate result of Defendants' retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of damages.

189.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief

190.    Defendants' unlawful and retaliatory conduct in violation of NYCHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## AND FOR A EIGHTH CAUSE OF ACTION
**(Aiding And Abetting Violations of NYCHRL Against Defendants Kiran)**

191.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

192.    Defendant Kiran knowingly and recklessly aided and abetted the unlawful employment practices and/or unlawful retaliation against Plaintiff in violation of NYCHRL.

193.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief against Defendant Kiran in his official and individual capacities.

194.    As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief against Defendant Kiran in his official and individual capacities.

195.    Defendant Kiran's unlawful retaliatory conduct in violation of NCHRL was willful, wanton, outrageous and malicious, and was done with conscious disregard of Plaintiff's civil rights, entitling her to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An order directing Defendants to place Dr. Keller in the position she would have occupied but for Defendants' discriminatory and otherwise unlawful treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect Dr. Keller, including an order directing Defendant NYP to rescind the NPDB Reports;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Dr. Keller for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, internal and extramural grant awards, wages, compensation, job security and other benefits of employment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Dr. Keller for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Dr. Keller for harm to her professional and personal reputations and loss of career fulfillment;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Dr. Keller in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages;

I.      An award of costs that Dr. Keller has incurred in this action, as well as Dr.

Keller's reasonable attorneys' fees to the fullest extent permitted by law; and

J.       Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  December 20, 2021
        New York, New York

GOODSTADT LAW GROUP, PLLC

By: _____
        George D. Vallas (GV-7685)
        Andrew S. Goodstadt (AG-2760)

520 8th Avenue, 14th Floor
New York, New York 10018
Telephone:      (646) 430-8295
Facsimile:      (646) 430-8294

COUNSEL FOR PLAINTIFF